MARTHA E. GODFREY v. NEW YORK LIFE INSURANCE COMPANY.[1]

November 24, 1897.

Nos. 10,846—(95).

### Life Insurance — Principal and Agent — Authority to Accept Notes for Premiums.

On the evidence and admissions *held* that, notwithstanding written instructions to the contrary, the agent of the insurer to solicit life insurance had authority to take promissory notes payable to himself for the first

[1] Reported in 73 N. W. 1.

premiums to be paid on the insurance policy, or that the insurer subsequently ratified his acts in taking the notes.

**Same—Husband and Wife—Settlement by Husband—Ratification by Wife.**

*Held,* the evidence is not conclusive that plaintiff by her delay and acquiescence ratified a settlement made for her by her husband, which he was not authorized to make, or that she had such knowledge of the material facts that, if she had ratified it, she would be bound by such ratification.

Other unimportant rulings disposed of.

Action to recover the sum of $98.90, expended by plaintiff in paying the promissory note mentioned in the opinion and in defending a suit against her upon that note. From an order of the district court for Rice county, Buckham, J., denying a motion for a new trial after a verdict for plaintiff, defendant appealed. Affirmed.

*Edwin A. Jaggard,* for appellant.

*Anson L. Keyes,* for respondent.

CANTY, J.

On November 8, 1894, the plaintiff through one Lucas, an agent of defendant, made an application to defendant for a policy of life insurance on her life payable to her executors, administrators or assigns. The first annual premium on the policy amounted to $83.60 and at the request of Lucas she made to his order her promissory note in writing for that sum, payable in one year from said date. The note was indorsed by her husband and she delivered it to Lucas together with said application. Lucas never turned the note over to the defendant company or accounted to it for the same, but before the maturity of the note he negotiated it in the due course of business to one Sanford who, in good faith and without notice, paid him therefor the full face of the same, so that plaintiff was obliged to pay, and did pay, Sanford the amount of the note. The policy, though prepared and executed by the company, was never delivered to her because Lucas did not account to the company for the first annual premium. The issuing of the policy was afterwards abandoned by both parties and plaintiff brought this action to recover from defendant the amount that she was compelled to pay Sanford as aforesaid. On the trial plaintiff

70 M.—15

had a verdict, and from an order denying a new trial defendant appeals.

1. It is contended by appellant that Lucas had no authority to take a promissory note in payment of the premium. It was admitted on the trial that one of defendant's written instructions to its agents is as follows:

"Agents are not authorized to make, alter or discharge contracts, to extend the time for paying any premium, to accept promissory notes, or anything but cash, in payment of the whole or any part of any premium."

But it was also admitted on the trial that Lucas,

"Acting as the agent of the defendant and within the scope of his authority as such agent, by representing to her (plaintiff) that the note hereinafter mentioned, or its equivalent, would be returned to her within thirty days from the notice of its rejection, in the event of her application being rejected, and no policy issued thereon, induced the plaintiff to make and deliver to him her negotiable promissory note in writing," etc., describing the note in question.

It also appeared by the evidence that Lucas took promissory notes payable to himself for the first premium with nearly every application which he received for life insurance for a period of several months, including the time in question. It also appears that a certain bank at Faribault discounted some of these notes, and a letter written by the general agent of the St. Paul branch of the defendant company to the banker tended to prove that the defendant had for some time known of the methods of Lucas, had approved of his practice of taking promissory notes for premiums and had received those notes from him in his accounting for his transactions. The testimony of said general agent, Waller, also tends to prove the same facts.

On this state of the evidence, it is hard to see how the jury could have found otherwise than that Lucas had authority to receive for the company the promissory note in question. Defendant had by its course of conduct clearly superseded and set aside its written instructions, at least as far as Lucas was concerned. True, plaintiff testified that at the time she made the application she asked Lucas why he took the note to himself, and he answered

"That he was acting for the company, and he said that he had to—they would take no notes, and he had to pay the money for it; and that is the reason he did that."

But she also testified that he said that he was acting for the company, and that it was responsible for whatever he did.   Even if this evidence tends to prove that he informed her that he had no authority to take notes in this manner, still the other evidence and admissions above referred to show that this was not true, and that in fact he had such authority originally, or that his acts were subsequently ratified.

2. Appellant further contends that by a subsequent transaction between Lucas and plaintiff she accepted the sole liability of Lucas, and released the defendant from liability.   It appears by the evidence that about a month after she gave the note to Lucas she was told by him at her home, some distance from Faribault, that she had been rejected and the company would not issue a policy to her. He also told her that her note was at Faribault and, if she would give him a receipt which he had given her when he took her application, he would send her the note.   Thereupon she gave the receipt to her husband with instructions not to give up the receipt until he got her note.   He went to Faribault December 31, 1894, surrendered the receipt and other like receipts of his own to Lucas, took the latter's check on a bank, payable in 90 days, for the total amount of his own and his wife's separate claims and signed for Lucas a certificate (Exhibit 4), which reads as follows:

"To the Northwestern Branch Office,
      New York Life Ins. Co., St. Paul, Minn.
   Gentlemen:   This is to certify that I have this day received from your agent, Robt. E. Lucas, full satisfaction for the premium given upon a policy upon myself and wife and afterwards surrendered for cancellation, and I herewith surrender and relinquish any and all claims against said company through said transaction.
                                  Yours very respectfully,
                                         J. A. Godfrey."

At the same time Lucas promised to get plaintiff's note for her. Lucas had previously promised defendant to settle the matter with plaintiff and he accordingly sent this receipt to the St. Paul office,

and thereupon defendant, on January 2, 1895, sent the following letter (Exhibit C) by mail to plaintiff's husband:

"We have to hand your favor of the 29th ult. (31st), to the effect that you have received from Mr. R. E. Lucas full satisfaction for two notes for $108 each and one note for $83.60, given by you in payment of premiums on applications for insurance of $2,000 on your life and $1,000 on the life of your wife, Martha E. Godfrey. We have, therefore, advised the company to consider your application as canceled."

Immediately after the husband surrendered the receipt to Lucas, he returned home, informed plaintiff that he had done so, and told her that she would have her note in a few days. The check given by Lucas was never presented for payment, but he never at any time had any funds in the bank on which he drew the check, and the same would never have been honored if presented. Neither plaintiff nor her said husband ever informed defendant of any of these facts, or took any steps to disavow the arrangement made with Lucas for the settlement of the claim until February 28, 1895, when the husband went to the St. Paul office, presented the check, informed defendant that Lucas never had any deposit in the bank on which the check was drawn, and asked the agent in charge if he called that a settlement. From what transpired at that time the jury were warranted in finding that the husband gave defendant to understand that he, for himself and his wife, repudiated the settlement with Lucas because of the fraudulent and worthless character of the check.

The evidence is quite conclusive that plaintiff never authorized her husband to surrender the receipt held by her except on the surrender to her of her note, or to take the check of Lucas, due in 90 days, or to sign and deliver to Lucas the certificate (Exhibit 4). We are also of the opinion that the evidence did not require the jury to find that plaintiff subsequently ratified the acts of her husband in surrendering the receipt, taking the check, and signing and delivering the certificate (Exhibit 4). Her delay after discovering the facts was not so great as to make it conclusive that she ratified the settlement with Lucas. The jury were warranted in finding that plaintiff never knew that her husband had made and delivered

Exhibit 4 until such time as she would have learned of that fact by having seen Exhibit C.

The evidence is somewhat uncertain and contradictory as to when she first saw or learned of Exhibit C, but the jury were warranted in finding that she did not see or hear of it until about January 20, 1895. The jury were also warranted in finding that she did not see the check, or at least did not know of its character, until about a week after it was given. The check was given by Lucas and the receipt surrendered to him December 31, 1894, or less than two months before defendant was notified that Lucas had attempted to settle the matter with his check, for the payment of which he had up to that time provided no funds. And by this time defendant had every reason to know from other transactions of his that Lucas was an embezzler and a defaulter, and would not have the funds on deposit to pay the check when it came due, and never intended to have.

Again, it does not appear when plaintiff learned of the worthless and fraudulent character of this check. It is, perhaps, fair to presume that she had learned of it at the time her husband showed it to defendant's general agent at St. Paul on February 28, and the evidence would warrant the jury in finding that she did not learn of it any sooner. The ratification of an unauthorized act is not binding unless made with knowledge of all the material facts; and, even if plaintiff had, by her acquiescence, ratified her husband's acts before she had knowledge of the worthless and fraudulent character of this check, she would not be bound, even though her husband still retained the worthless check. Neither does it appear that defendant has been prejudiced or put in a worse position by reason of any act or neglect of plaintiff.

3. There are 12 pages of assignments of error in this case, which involves only $100. As to the first assignment of error, the request to charge is not warranted by the facts. As to the second, the request is not good law. As to the third, it assigns as error nearly three pages of the court's charge, considerable (if not all) of which is good law, and there is no exception to it as a whole, or even to any part of it which is bad law. The other assignments of error are to the rulings of the court, in none of which do we find any error, except possibly in one or two where it is error without prejudice,

as the fact to which the question relates was conclusively established by other evidence or by the admissions on the trial.

The order appealed from is affirmed.